**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

|  |  |
|---|---|
| Ernesto Rivera, Johnny Mize, Robert Steven Pritchett, Dora Smith, | : |
| | : |
| | : |
| Plaintiffs, | : |
| vs. | : Civil Case No.: 2:19-cv-7 |
| | : |
| BMW of North America, LLC and Bavarian Motor Works, | : |
| | : |
| Defendants. | : |
| | : |

**COMPLAINT**

For this Complaint, the Plaintiffs[1] Ernesto Rivera, Johnny Mize, Robert Steven

Pritchett, Dora Smith, by undersigned counsel, state as follows:

**PRELIMINARY STATEMENT**

1.      This is a group action by the purchasers of vehicles (hereafter the "subject

vehicles") manufactured and sold by the Defendants BMW of North America, LLC and

Bavarian Motor Works.  Plaintiffs seek damages related to their vehicles' excessive

consumption of engine oil and Defendants' failure to honor the terms of their warranty.

2.      The Plaintiffs would not have purchased the subject vehicles had they been

made aware of the subject vehicles' defective engines.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over this matter pursuant to the Magnuson-Moss

Federal Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiffs claim more than $50,000.00 in

damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction

---

[1]Additional Plaintiffs may be added at a later date.

as set forth in 28 U.S.C. § 1367.

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) as

Defendants are subject to personal jurisdiction in this District and where Defendants, as

principals, direct and control warranty repairs on covered vehicles through its agents

consisting of a dealership network located in this District.

5.      Further, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2)

in that a substantial part of the events giving rise to the Plaintiffs' claims occurred within this

District.

## PARTIES

6.      Plaintiffs were, at all relevant times, adult individuals who either reside in

Texas and/or who purchased motor vehicles in Texas which were manufactured or sold by

Defendants.

7.      Defendant BMW of North America, LLC ("BMW-NA") is organized under

the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road,

Woodcliff, New Jersey. BMW-NA was created in 1975 to act as the United States importer of

BMW luxury and performance vehicles, which were traditionally manufactured in Munich,

Germany.  At all relevant times, BMW was engaged in the business of importing, assembling,

marketing, distributing, and warranting BMW automobiles in the State of Texas and

throughout the United States.

8.      Defendant Bavarian Motor Works ("BMW-GER") is a corporation organized

and existing under the laws of Germany, with its principal place of business located in

Munich, Bavaria, Germany.  BMW-GER is the parent corporation of BMW of North

America, LLC.

9.      BMW-NA and BMW-GER sell BMW vehicles through a network of independently owned dealerships across the United States that are agents of BMW-NA and BMW-GER.

**FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFFS**

**I.    Ernesto Rivera**

10.     Plaintiff Ernesto Rivera (hereafter "E. Rivera") is an adult individual residing in Amarillo, Texas.

11.     On or about April 3, 2009, E. Rivera purchased a new 2009 BMW 7 Series 750Li, Vehicle Identification Number WBAKB83569CY59045 (hereafter the "E. Rivera Vehicle") from an authorized dealer of Defendants.

12.     Within a year after purchasing the E. Rivera Vehicle, E. Rivera observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 750 miles throughout the warranty period and well before the Defendants' recommended oil change intervals.

13.     E. Rivera notified an authorized dealer of the Defendants during the warranty period that the E. Rivera Vehicle consumed an excessive amount of engine oil.

14.     In response, the dealer told E. Rivera that nothing was wrong and the oil consumption was normal for the vehicle.  Accordingly, the dealer did not offer any repairs to resolve the vehicle's excessive oil consumption.

15.     As a result of the E. Rivera Vehicle's excessive consumption of engine oil, E. Rivera had to add engine oil to the E. Rivera Vehicle in between the Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

## II.     Johnny Mize

16.     Plaintiff Johnny Mize (hereafter "J. Mize") is an adult individual residing in Amarillo, Texas.

17.     On or about July 3, 2012, J. Mize entered into a lease for a new 2012 BMW 550i, Vehicle Identification Number WBAFR9C53CDX79240 (hereafter the "J. Mize Vehicle") from Alderson Enterprises, L.P.

18.     At the conclusion of the three year lease, J. Mize purchased the subject vehicle.

19.     Fairly soon after purchasing the J. Mize Vehicle, J. Mize observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 4,500 miles throughout the warranty period and well before the Defendants' recommended oil change intervals.

20.     J. Mize notified an authorized dealer of the Defendants during the warranty period that the J. Mize Vehicle consumed an excessive amount of engine oil.

21.     In response, the dealer told J. Mize that the oil consumption was normal and accordingly, the dealer did not offer any repairs to resolve the vehicle's excessive oil consumption.

22.     Over time, the J. Mize Vehicle's excessive oil consumption has worsened.

23.     As a result of the J. Mize Vehicle's excessive consumption of engine oil, J. Mize had to add engine oil to the J. Mize Vehicle in between the Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

## III.     Robert Steven Pritchett

24.     Plaintiff Robert Steven Pritchett (hereafter "R. Pritchett") is an adult individual residing in Amarillo, Texas.

25.     On or about December 31, 2012, R. Pritchett purchased a new 2013 BMW X5, Vehicle Identification Number 5UXZV8C56D0C15629 (hereafter the "R. Pritchett Vehicle") from Autoplex BMW, an authorized dealer of the Defendants.

26.     After purchasing the R. Pritchett Vehicle, R. Pritchett observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 500 to 700 miles throughout the warranty period and well before the Defendants' recommended oil change intervals.

27.     R. Pritchett notified an authorized dealer of the Defendants during the warranty period that the R. Pritchett Vehicle consumed an excessive amount of engine oil.

28.     In response, Defendants' authorized dealer told R. Pritchett that such a high level of oil consumption was normal and insisted the burn rate was within manufacturer's specs.  Accordingly, the dealer did not offer any repairs to resolve the vehicle's excessive oil consumption.

29.     As a result of the R. Pritchett Vehicle's excessive consumption of engine oil, R. Pritchett had to add engine oil to the R. Pritchett Vehicle in between the Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

**IV.   Dora Smith**

30.     Plaintiff Dora Smith (hereafter "D. Smith") is an adult individual residing in Fort Worth, Texas.

31.     On or about December 27, 2013, D. Smith purchased a used 2012 BMW 7 Series 750i, Vehicle Identification Number WBAKA8C55CDS99569 (hereafter the "D. Smith Vehicle") from Arlington BMW, an authorized dealer of the Defendants.

5

32.     Soon after purchasing the D. Smith Vehicle, D. Smith observed that it consumed an excessive amount of engine oil which required her to add one quart of oil every 1,000 miles throughout the warranty period and well before the Defendants' recommended oil change intervals.

33.     D. Smith notified an authorized dealer of the Defendants during the warranty period that the D. Smith Vehicle consumed an excessive amount of engine oil.

34.     In response, Defendants' authorized dealer told D. Smith that it was just time to change the vehicle's oil and did not indicate that such consumption was a problem.  The dealer did not offer any repairs to resolve the vehicle's excessive oil consumption.

35.     As a result of the D. Smith Vehicle's excessive consumption of engine oil, D. Smith had to add engine oil to the D. Smith Vehicle in between the Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

**FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS**

36.     Defendants manufactured and placed into the stream of commerce each of the aforementioned vehicles (the subject vehicles), which the Plaintiffs subsequently purchased.

37.     At the time Plaintiffs purchased the subject vehicles, Defendants made representations as to the subject vehicles' performance and quality and assured the Plaintiffs that the subject vehicles were free from defects of workmanship.

38.     Thereafter, Plaintiffs discovered that, unbeknownst to them, the subject vehicles' engines contain a manufacturing defect which causes each of the subject vehicles to consume engine oil at an extremely rapid rate.

39.     Moreover, Plaintiffs discovered that as a result of the subject vehicles' above-described defect, Plaintiffs were required to regularly add additional engine oil to their

vehicles in between the Defendants' recommended oil change intervals in order to prevent their vehicles' engines from failing and suffering from other related damage.

40.     In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63."  This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years.

41.     Upon information and belief, the N63 engine was included on the V8 versions of the following BMW vehicles:

> F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
> F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012
> F07 (Gran Turismo) – produced from 9/2009 to 6/2012
> F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
> F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
> F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
> E70 (X5) – produced from 3/2010 to 6/2013
> E71 (X6) – produced from 7/2008 to 6/2014
> E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

42.     The subject vehicles are all equipped with the N63 engine.

43.     The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63 engines consume excessive amounts of engine oil and require frequent engine repairs, especially as compared to other, similar vehicles not containing N63 engines.

44.     Some owners and enthusiasts blame the oil consumption on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

45.     N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

46.     The oil consumption defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles. (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

47.     The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015. BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers. Finally, the V8 version of the X5 was the fifth worst performer in the study.

48.     The Consumer Reports study also shows that a greater percentage of defective models start to consume oil as they age.  This means that large numbers of N63 owners will begin to experience the oil consumption defect in the near future if they have not already.

49.     Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the oil consumption defect.

50.     For example, one N63 purchaser started a thread entitled, "Excessive oil consumption" on a BMW enthusiast website in November 2011:

So I'm starting to get a little irritated at how much oil my 550 is burning. In the last 6k I've had to add 1 quart of oil three times.  In other words it is burning a quart every 2000 miles.  I've read about some people posting about having to add oil before but this much?? I've never owned a new car that burned any oil much less at this rate. Anyone else having this issue?  Oh btw the car has 9120 miles and I put 3100 in Europe during my ED.  When I was to have redelivery I had the dealer do an oil change and was gonna change the oil every 7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072.)

51.     A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

52.     An Internet search of "N63 AND Burning Oil" reveals thousands of similar complaints regarding the oil consumption defect.[2]

53.     BMW had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines, not known or reasonably discoverable by consumers. Defendants, however, failed to disclose the defect to consumers prior to or at the time of purchase or lease.

54.     The oil consumption defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.[3]

55.     With regard to the oil consumption issue, BMW issued the following TSBs:

NHTSA ID Number: 10046859

---

[2] See, e.g., http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Mar. 21, 2016); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Mar. 21, 2016).
[3] TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles.

Service Bulletin Number: SIB-11-08-12
Summary: DUE TO DAMAGED SEAL RING, DURING
ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL
PUMP VOLUME CONTROL VALVE GASKET SEAL RING.
MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL
YEARS LISTED.

_____

NHTSA ID Number: 10045282
Service Bulletin Number: SIB-11-07-12
Summary: BMW: WHILE DRIVING VEHICLE, AT TIMES
WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE
SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL IS
CONSUMED ABOVE SPECIFICATIONS.

56.     In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of changing engine oil consumption specifications for N63 vehicles, and specifically instructed service technicians to add two quarts of engine oil to N63 vehicles when the vehicles instruct owners to add only one additional quart of oil.

(http://www.xbimmers.com/forums/showthread.php?p=14449679.)

57.     Instead of addressing the underlying cause of excessive oil consumption in order to attempt to fix the defect, BMW recommended that its service technicians simply add more engine oil to respond to consumer complaints. Technicians were instructed to add two quarts of engine oil when the vehicles electronic system specifically called for one additional quart and to also add an additional quart as the default fill on N63 vehicles. While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in the subject vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

58.     Technical Service Bulletin SIB-11-03-13 appears to be part of a campaign to conceal the oil consumption defect and represent it as a normal feature of BMW vehicles. To

this effect, BMW issued SIB-11-03-13, which upon information and belief includes the

following:

> Service Bulletin Number: SIB-11-03-13
>
> Summary: All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped. In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not fully seated (break-in). Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.
>
> Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.
>
> Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the turbocharger lubrication requirements. Some of the engine oil normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.
>
> All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.
>
> Oil Consumption specification:
> - All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.
> - Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.
> Turbocharged Engines:

Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SIB-11-03-13 for additional details.

59.     BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize their own responsibility and/or deflect blame onto consumers for the oil consumption defect. As can be seen from the TSBs, Defendants continued to misrepresent to their customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

60.     BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the subject vehicles was the earlier of 15,000 miles or two years. Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil between the recommended 15,000-mile oil service intervals. Clearly, there is nothing normal or expected about this rate of oil consumption.

61.     Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

62.     Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.* (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

63.     Following hundreds of customer complaints about the oil consumption defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package"). The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the oil consumption defect.

64.     The Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary. BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

65.     Also, BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval. The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for the subject vehicles. As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

66.     BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

67.     BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

68.     Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the subject vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

69.     As suggested by the N63 Customer Care Package, upon information and belief, the oil consumption defect impacts several components of N63 vehicles, either via combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate lubrication, which results in these components to prematurely fail and need frequent replacement.

70.     The oil consumption defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.  Therefore, this oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Plaintiffs, their passengers, and others who share the road with them to serious risk of accidents and injury.

71.     Plaintiffs are informed and believe, and based thereon allege that BMW acquired its knowledge of the oil consumption defect in 2008, if not before, through sources not available to Plaintiffs, including but not limited to pre-release testing data, durability testing, early consumer complaints about the oil consumption defect to Defendants and their

dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as, from other internal sources.

72.     Defendants had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs to Plaintiffs because the defect poses an unreasonable safety hazard, and because Defendants had exclusive knowledge or access to material facts about the subject vehicles that were not known or reasonably discoverable by the Plaintiffs. Defendants, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

73.     The oil consumption defect can be and has been enormously consequential to Plaintiffs, burdening them with out-of-pocket expenses that would not be necessary but for such defect and depriving them of their original bargains.  First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the recently decreased oil change intervals, which the Plaintiffs specifically sought to avoid by purchasing high-end BMW vehicles. Second, the oil consumption defect means that Plaintiffs must be concerned with obtaining BMW-approved engine oil when needed.  If Plaintiffs continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident.  This discourages Plaintiffs from traveling long distances in their N63 vehicles or forces them to carry an extra supply of oil.  Third, Plaintiffs will suffer significant loss when they sell the subject vehicles because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the oil consumption defect.

74.     Plaintiffs each provided Defendants or one or more of its authorized dealers with an opportunity to repair the problems with the subject vehicles. The Defendants have neglected, failed, refused or otherwise been unable to repair the substantial impairments to the subject vehicles within a reasonable amount of time or a reasonable number of attempts.

75.     The oil consumption defect experienced by the Plaintiffs substantially impairs the use, value and safety of the subject vehicles to the Plaintiffs.

76.     The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the vehicles.

77.     The Plaintiffs would not have purchased the subject vehicles had they known, prior to the respective times of purchase, that they would be required to regularly purchase and add large volumes of engine oil to the subject vehicles in order to prevent the subject vehicles' engines from failing.

## FRAUDULENT CONCEALMENT TOLLING

78.     Plaintiffs did not and could not have known that there was an oil consumption defect with the subject vehicles' respective engines at the time that they purchased the subject vehicles or any time thereafter.

79.     The breach of warranties four-year statute of limitations, which might otherwise apply to bar some of the Plaintiffs' claims, should be tolled because of Defendants' knowing and active concealment of the fact that the subject vehicles' engines contain a defect.

80.     While Defendants issued TSB's making clear they were aware that there was a defect with the subject vehicles' engines, Defendants failed to disclose the existence of the defect to Plaintiffs.

16

81.     Moreover, Defendants' authorized dealerships informed some or all of the Plaintiffs that the subject vehicles' excessive consumption of engine oil was normal, rather than the result of a defect.

82.     Defendants kept Plaintiffs ignorant of vital information essential to the pursuit of their claims.

83.     Defendants knowingly, affirmatively, and actively concealed the subject vehicles' defect from the Plaintiffs.

84.     Defendants were aware of the defect with the subject vehicles.

85.     Based upon the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## FIRST CAUSE OF ACTION
### Breach of Warranty Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*

86.     The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

87.     The Plaintiffs are each a "consumer" as defined in 15 U.S.C. § 2301(3).

88.     Defendants are each a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

89.     The subject vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6). 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

90.     15 U.S.C. § 2304(a)(1) requires Defendants, as warrantors, to remedy any defect, malfunction or nonconformance of the subject vehicles within a reasonable time and without charge to the Plaintiffs.

91.     Despite repeated demands, Defendants have failed to remedy the subject vehicles' oil consumption defect within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the subject vehicles.

92.     As a result of Defendants' breaches of written and implied warranties, and Defendants' failure to remedy the same within a reasonable time and without charge to Plaintiffs, Plaintiffs have suffered damages.

## SECOND CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. §2301, *et seq.* and Tex. Bus. & Com. Code § 2.314**

93.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

94.     Defendants are merchants with respect to motor vehicles.

95.     The subject vehicles were each subject to implied warranties of merchantability, as defined in 15 U.S.C.  § 2308 and V.T.C.A., Bus. & C. § 2.314, running from the Defendants to the Plaintiffs.

96.     An implied warranty that the subject vehicles were merchantable arose by operation of law as part of the purchase of the subject vehicles.

97.     Defendants breached the implied warranty of merchantability in that the subject vehicles were not in merchantable condition when the Plaintiffs purchased them, or at any time thereafter, and the subject vehicles are unfit for the ordinary purposes for which such vehicles are used.

98.     Plaintiffs notified Defendants of the defects in the subject vehicles within a reasonable time after Plaintiffs discovered them.

99.     As a result of Defendants' breaches of the implied warranty of merchantability, Plaintiffs have suffered damages, including but not limited to incidental and consequential damages.

### THIRD CAUSE OF ACTION
**Breach of Express Warranties**
**Tex. Bus. & Com. Code § 2.313**

100.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

101.    In connection with the sale of the subject vehicles to the Plaintiffs, Defendants provided the Plaintiffs with a New Vehicle Limited Warranty and Certified Pre-Owned Warranty, under which they agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

102.    Plaintiffs relied on Defendant's warranties when they agreed to purchase or lease the subject vehicles and Defendant's warranties were part of the basis of the bargain.

103.    Plaintiffs submitted their vehicles for warranty repairs as referenced herein. Defendants failed to comply with the terms of the express written warranty provided to each Plaintiff, by failing and/or refusing to repair the oil consumption defect under the vehicles' warranty as described herein.

104.    Plaintiffs have given Defendants reasonable opportunities to cure said defect, but Defendants have been unable and/or has refused to do so within a reasonable time.

105.    As a result of said nonconformities, Plaintiffs cannot reasonably rely on the subject vehicles for the ordinary purpose of safe, comfortable, and efficient transportation.

106.    The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the subject vehicles.

107.    The Plaintiffs would not have purchased or leased the subject vehicles, or would have paid less for the subject vehicles, had they known, prior to their respective time of purchase or lease, that the subject vehicles contained the oil consumption defect.

108.    As a direct and proximate result of the willful failure of Defendants to comply with their obligations under the express warranties, Plaintiffs have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the subject vehicles containing the defects identified herein.

## FOURTH CAUSE OF ACTION
### Violation of the Texas Deceptive Practices Act
### Tex. Bus. & Com. Code § 17.41, *et seq.*

109.    The Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

110.    The subject vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattels that were purchased or leased for use.

111.    Each Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

112.    Plaintiffs are "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired the subject vehicles by purchase or lease.

113.    At all relevant times, Defendants have engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing,

and/or distributing the subject vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

114.     The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, *et seq.*  Specifically, as described above, Defendants misrepresented that the subject vehicles have characteristics, uses, and/or benefits that they do not have.  Furthermore, Defendants failed to disclose information concerning the subject vehicles that was known at the time of their sale, and such failure to disclose that information was intended to induce consumers into purchases they would not have entered had the information been disclosed.

115.     Plaintiffs relied to their detriment on those false, misleading, or deceptive acts or practices.

116.     Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiffs.

117.     Defendants' intentional concealment of and failure to disclose the oil consumption defect constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiffs, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiffs.

118.     Defendants are also liable under Tex. Bus. & Com. Code § 17.50(a) because Defendants breach of the implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiffs.

21

119.    Defendants' violations of the DTPA were made in connection with the purchase or lease of the subject vehicles by Plaintiffs.

120.    Plaintiffs relied on Defendants to disclose material information it knew, such as the defective nature of the vehicles equipped with the N63 engine, and not to induce them into transactions the would not have entered had the Defendants disclosed this information.

121.    Plaintiffs have provided adequate notice to Defendants.

122.    Plaintiffs should be awarded three times the amount of their economic damages because Defendants intentionally concealed and failed to disclose the defective nature of the subject vehicles.

## **DEMAND FOR RELIEF**

WHEREFORE, the Plaintiffs demand judgment against Defendants as follows:

a.  An order approving revocation of acceptance of the subject vehicles;

b.  Money damages, in the form of a refund of the full contract prices, including, trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiffs on the subject contracts;

c.  Equitable relief including, but not limited to, replacement of the subject vehicles with new vehicles, or repair of the defective subject vehicles with an extension of the express and implied warranties, and service contracts which are or were applicable to the subject vehicles, in the event that Plaintiffs are not found to be entitled to revocation;

d.  Incidental and consequential damages;

e.  Punitive damages;

f.  Reasonable attorney's fees;

g.   Such other and further relief as this Court deems just and proper.

## TRIAL BY JURY DEMANDED ON ALL COUNTS

Dated: January 8, 2019

Respectfully submitted,

By:   */s/ Jody B. Burton*

Jody B. Burton, Esq.
LEMBERG LAW, L.L.C.
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile:  (203) 653-3424
*Attorneys for Plaintiffs*